**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBIN R. PUCHALSKI, | ) | |
| | ) | CASE NO.   1:08-cv-2404 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| Defendant. | ) | |

This case is before the magistrate judge by the consent of the parties.  Plaintiff,

Robin R. Puchalski ("Puchalski"), challenges the final decision of the Commissioner of

Social Security, Michael J. Astrue ("Commissioner"), denying Puchalski's application for a

period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 416(i), and for Supplemental Security Income ("SSI") under Title XVI of the

Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction

pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the court VACATES the decision of the

Commissioner and remands the case for further proceedings consistent with this decision.

I.  Procedural History

Puchalski filed an application for DIB and SSI on May 20,2003, alleging disability

due to osteoarthritis, fibromyalgia, depression, and anxiety as of September 16, 2002.  Her application was denied initially and upon reconsideration.  Puchalski timely requested an administrative hearing.

Administrative Law Judge Peter Beekman ("ALJ") held a hearing on June 21, 2005.  Puchalski, represented by counsel, testified on her own behalf at the hearing.  Barbara Burk testified as a vocational expert ("VE"), and Melvin Ross testified as a medical expert ("ME").  The ALJ issued a decision on June 30, 2005, in which he determined that Puchalski is not disabled.  Puchalski requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on August 13, 2008, the ALJ's decision became the final decision of the Commissioner.

Puchalski filed an appeal to this court on October 9, 2008.  Puchalski alleges that the ALJ erred because (1) the ALJ failed to consider whether Puchalski's fibromyalgia was a severe impairment; (2) the ALJ found Puchalski not to be credible; (3) the ALJ failed properly to evaluate Puchalski's allegations of pain as a disabling condition; and (4) the ALJ failed to articulate a definition for "moderate restriction," thus precluding substantial evidence for his reliance on the VE's testimony.  The Commissioner denies that the ALJ erred.

## II.  Evidence

### A.    Personal and Vocational Evidence

Puchalski was born on November 17, 1960 and was 44 years old at the time of her hearing.  She has a high school education and a year of college.  She has past relevant work experience as a title searcher, a medical assistant, and as a welder.  This work ranged from light to medium exertional levels and from skilled to semi-skilled in nature.

2

B.    *Medical Evidence*

The record shows that Puchalski was treated for stress, anxiety, and pain as early as May 1996.  Transcript ("Tr."), pp. 115-16.  In July 2002, Puchalski reported suffering from pelvic pain.  Radiographic studies found no abnormalities in the lumbar spine other than mild scoliosis.  Tr. at 118.

On September 16, 2002, Puchalski suffered a severe panic attack at work.  Tr. at 63, 146-51.  Such attacks, according to Puchalski, come on very suddenly and result in paralysis, numbness, and shortness of breath.  Tr. at 63, 70.  An ambulance took her to Cleveland Metro Hospital, where she complained of fatigue, burning in her chest and neck, numbness, "tunnel vision," and lightheadedness.  The notes of her treating physician reported that Puchalski had suffered such attacks previously and that they were coming more frequently.  Tr. at 150, 152.  Physical examination revealed no abnormalities.

On June 23, 2003, Puchalski completed a functional report at the request of the Bureau of Disability Determination ("the Bureau").  Tr. at 81-88.  She stated that she lived with her adult daughter, a son age 19, a son age 16, and two grandchildren.  According to Puchalski, on an average day she got out of bed, did strength training and low impact aerobics at the request of her treating physician, performed stretching to allow her to move, and took a hot bath to relax her muscles.  She then did housework.  Puchalski reported that she was able to clean the house little by little, with some help from her grandchildren, if she rested repeatedly.  Vacuuming was especially hard, Puchalski wrote, but she was able to do it with difficulty.  She said that she was also able to cook, do laundry, and garden.  She was able to shop for food and clothes, although she wrote that her husband did most of the food shopping and accompanied her generally when she shopped.  Puchalski also noted

3

that it was hard to walk, stand, or sit for any length of time, partly because her feet became swollen.  She could walk about 20 minutes at the most before having to rest.  She also reported panic attacks, depression, problems with memory, spinal pain, joint and muscle pain, tenderness, tiredness, difficulty sleeping, general swelling, pain in raising arms above her head, burning sensations, difficulty speaking, and difficulty holding heavy things.  She had difficulty dressing, getting in and out of the bathtub, and washing and brushing her hair.  Puchalski reported that her hobbies were gardening, watching movies (usually on tape at home), singing, and fast walking.  She also reported, however, that she was only able to garden twice a month and was unable to walk as fast or as long as she once did.  Puchalski left the house once a week for church, once a week for four hours at a time as a volunteer answering telephones, and to take a class at Cleveland Community College.

Puchalski's treating psychologist,[1] Melvin Painter, Ph.D., completed a form at the request of the Bureau on June 25, 2003.  Tr. at 153-55.  Dr. Painter described Puchalski as very depressed and anxious, with a low tolerance for frustration and stress and difficulty in maintaining attention and concentration.  He also opined that Puchalski was limited by panic attacks and difficulty breathing.  These symptoms were brought on by physical problems, conflict, and tension.  The symptoms had lasted for more than a year and had only a limited response to treatment.  Dr. Painter diagnosed Puchalski as suffering from panic attacks and agoraphobia.

Puchalski's treating physician, John Zangmeister, M.D., completed an assessment of Puchalski at the request of the Bureau on June 26, 2003.  Tr. at 156-58.  Dr.

---

[1]  Dr. Painter saw Puchalski only between October 23, 2002 and November 13, 2002.

4

Zangmeister described Puchalski as having a history of depressed affect, difficulty with concentration, frequent panic attacks, and insomnia.  He also reported that her cognitive status was generally good when she was not overwhelmed by her symptoms and that currently her depression and panic attacks were fairly controlled by medication.  Specifically, Puchalski's panic attacks had dropped to one or two a month.  According to Dr. Zangmeister, Puchalski's multiple myalgias, back pain, and headaches gave her much difficulty with bending and lifting, but these had no effect on her behavior.  He also opined that she had a fair tolerance for stress.  Dr. Zangmeister diagnosed Puchalski as suffering from fibromyalgia, depression, and panic attacks.  He recommended that Puchalski try counseling.

On July 2, 2003, John Gentner, D.C., examined Puchalski and found right flexion and rotation of 15 degrees and left flexion and rotation of 20 degrees in the thoracolumbar spine.  Tr. at 159, 205.  X-rays revealed hyperkyphosis and degenerative disc disease in the thoracic spine in T4-T8.  He diagnosed Puchalski as suffering from chronic thoracolumbar sprain/strain.  Dr. Gentner noted that current therapy was chiropractic care, supportive car, and stretching/exercise.  He opined that Puchalski could sit for a total of 20-30 minutes at a time; could stand or walk for 30-45 minutes at time; and should not engage in lifting, bending, or carrying.  He also opined that Puchalski should stop every 45 minutes to stretch if traveling.  A later evaluation of Puchalski's range of motion in the lumbar spine found her range reduced in all directions by approximately one third.  Tr. at 201.  An undated letter noted that Dr. Gentner had treated Puchalski conservatively and had resulted in favorable strides and some exacerbations to the injured area.  Tr. at 207.  He suggested aquatic therapy three times a week for four weeks for Puchalski to make further

5

progress.

Dr. Zangmeister continued to treat Puchalski for fibromyalgia and panic attacks in July through November 2003.  Tr. at 225-29.  He noted continued problems with insomnia, pain and tingling in the upper body in many locations, and burning sensations in the chest. Dr. Zangmeister opined that Puchalski could lift or carry up to ten pounds, could carry five pounds frequently, could walk for three to four hours in an eight-hour day, and could walk for one hour without interruption.  Tr. at 230.  He cited loss of muscle tone, reduced flexion and rotation to the right in the thoracic spine, and reduced flexion and extension as medical findings supporting his assessment.  On January 20, 2004, Dr. Zangmeister diagnosed Puchalski as suffering from fibromyalgia and restricted her to lifting less than 15 pounds. He also barred repetitive twisting and bending and prolonged standing or walking.  Tr. at 232.

Mitchell Wax, Ph.D., a psychologist, examined Puchalski at the request of the Bureau on September 8, 2003.  Tr. at 160-65.  Puchalski complained of fibromyalgia, depression, temporomandibular joint disorder, sinus problems, and migraine headaches. She was taking Paxil and Neurontin.  Puchalski said that she had quit counseling because she could no longer afford it.  Her comments indicated that she had problems with her marriage.  She took care of herself, and her self-description indicated someone who was impulsive and compulsive.  Dr. Wax found no tendency to exaggerate or minimize her symptoms.  Except for marginal coherence, conversation and thought were normal. Puchalski described sleep difficulties; crying spells two or three times a week; and occasional feelings of helplessness, hopelessness, and worthlessness. Puchalski also said that she used to be apprehensive about the future but that she did not care anymore.  She

6

reported that she had daily panic attacks that included lightheadedness and numbness. Tests of cognitive functioning scored in the low average to average range, and Dr. Wax noted that the results may have been affected by anxiety or possible malingering.

Puchalski described herself as going to bed between 10 p.m. and 11 p.m. but often not falling asleep until midnight or 1 a.m.  She said that she is up frequently during the night, finally waking anywhere from 5 a.m. to 11 a.m. and then napping three times a day for 20 minutes at a time.  She took a half hour walk, exercised, and did yoga in the morning.  She did dishes, laundry, and mopping daily, vacuumed every other day, and cleaned the house regularly.  She also gardened and baked.  She went shopping with her husband once a month and went out shopping by herself about twice a week on "good days."  She went to church once a week, took music lessons, and wrote music.

Dr. Wax suspected that Puchalski quit counseling because she did not want to go, as she had medical insurance through her husband's job and had money for such things as music lessons.  He found her to be mildly impaired in her ability to relate to others; mildly impaired in her ability to maintain attention, concentration, and pace; significantly impaired in her ability to withstand stresses and pressures associated with day to day work; and able to perform simple, repetitive tasks.  Dr. Wax diagnosed Puchalski as suffering from depression and panic disorder with agoraphobia and assigned her a Global Assessment of Functioning ("GAF") of 61.[2]

Samad Saegh, M.D., also examined Puchalski on September 8, 2003.  Tr. at 166-

---

[2]  A GAF of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning fairly well and having some meaningful relationships.

72.  He noted that she was taking Paxil, Alprazolam, and phenozopyrizine and that these medications helped with her anxiety and depression.  Nevertheless, Puchalski still reported daily anxiety attacks with such physical manifestations as burning in the chest, left arm, and head; lightheadedness; nausea; and headaches.  Puchalski also reported that she had been diagnosed as suffering from fibromyalgia and osteoarthritis, for which she was taking Bextra, Elavil, and Neurontin. Despite these medications, Puchalski told Dr. Saegh that she had constant pain averaging from six to eight on a scale of ten.  According to Puchalski, yoga helped with the pain, but muscle strengthening exercises made it worse.  Dr. Saegh noted:

> [Pain] has limited her activities.  She has more pain sitting, standing, walking, running or climbing up steps.  She stated that her knees, ankles, and hands swell up at times.  She was not been seen by a rheumatologist.  At times she has problems opening a jar or with handwriting.  She stated that her equilibrium goes off at times and she has problems with getting words out.  She has more problems in the pelvic area.  Sitting or standing 5 minutes or so causes more pain.  She has to get up slowly and cannot do much of anything.  She has to go up steps on her knees and this is very painful.

Tr. at 167.  A physical examination detected no abnormalities except a slight ringing in Puchalski's ears, a tenderness in the supra-pubic area, and muscle tenderness all over, especially in the back.  Puchalski also reported pain with normal range of motion in every joint.  She walked slowly but normally.

In September through November of 2003, Dr. Gentner noted that Puchalski had regressed or exacerbated her injuries.  Tr. at 212-16.  He recommended ultrasound, heat, and electrical stimulation in addition to chiropractic manipulation.  By the latter part of November, Dr. Gentner was again noting improvement in Puchalski's condition.  Tr. at 217, 223.

8

On October 7, 2003, Phyllis Rosen, Ph.D., completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique assessing Puchalski.  Tr. at 175-90.  Dr. Rosen found that Puchalski suffered from depression characterized by sleep disturbance and feelings of guilt or worthlessness and from recurrent panic attacks occurring at least once a week.  She opined that Puchalski was moderately limited in her abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, and to respond appropriately to changes in her work setting.  She also opined that Puchalski was mildly limited in her activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace.  Dr. Rosen found no other limitations.  She summarized her findings as follows:

> Clmt has a depressive d/o and panic attacks with mild agoraphobia.  She is able to follow instructions, to sustain concentration and to interact with others.  However, her ability to cope with the stressors of every day work life is moderately limited by her anxiety and depression.  She does take care of her grandchildren, all household chores; she tends to her garden, does aerobic exercises, strength building, yoga, takes music lessons and writes music.  She has 5 friends with whom she talks once or twice a month.  Although she doesn't like to go out by herself, she does run to the store a couple times a month, and can go out if motivated.  The clmt has the mrfc for work-like tasks.

Tr. at 178 (punctuation and abbreviations in the original).  Robert Gaffey, Ph.D., affirmed Dr. Rosen's opinions on January 6, 2004.

Dr. Zangmeister continued to treat Puchalski from November 19, 2003 through May 22, 2004 for fibromyalgia, cystitis, headaches, memory loss and confusion, panic attacks, depression, and sinus problems.  Tr. at 235-42.

On May 31, 2005, Puchalski reported that her medications included Amitriptyline,

9

ibuprofen, Neurontin, Nulev, Ciprofloxacin, Endocet, and Zocor.  Tr. at 112-13.

C.    *Hearing testimony*

At the hearing on June 21, 2005, Puchalski testified that arthritic flare-ups confine her to bed and last from two days to a week.  Tr. at 272-73.  According to Puchalski, her fibromyalgia manifests itself as burning, numbness, and tingling in her posterior side combined with nausea, loss of memory, forgetfulness, difficulty moving, sharp pains, cramps, and muscle spasms.  Tr. at 273-74.  Puchalski asserted that arthritic flare-ups and fibromylagic symptoms are aggravated by exercise, including gentle exercise.  Tr. at 278-79.  She described herself as suffering from crying jags that confine her to her room when depression hits, and she said that she suffered side effects from antidepressants.  Tr. at 279-80, 282-83.

Puchalski testified that others took out the trash, did laundry, did above-the-head cleaning, and cooked, although she folded laundry and sometimes cooked.  Tr. at 276-77.  She also stated that she drove and went to church on Sunday.  Tr. at 274, 278.  Puchalski told the ALJ that she was no longer receiving counseling for her anxiety because she could not afford it.  Tr. at 277.

After reviewing Puchalski's record and listening to her testimony, the ME testified that Puchalski suffered from dysthymia and a generalized anxiety disorder.  Tr. at 285.  He opined that Puchalski's mental impairments resulted in mild restrictions on activities of daily living;  mild difficulties in maintaining social functioning;  difficulties maintaining concentration, persistence, or pave; and one or two repeated episodes of decompensation.  He also opined that Puchalski had restrictions on her residual functional capacity, but there is no evidence in the transcript that he testified regarding the nature or extent of those

10

restrictions.[3]

The ALJ asked two hypothetical questions of the VE. First, the ALJ asked the VE to assume an individual who can carry or lift up to 10 pounds frequently; can stand or walk 4 hours out of 8; can sit for six hours out of 8; can occasionally push, pull, or use a foot pedal; can not climb a ramp or stairs; can occasionally use a ladder, rope, or scaffold; can occasionally balance, stoop, kneel, or crouch; can not crawl or reach overhead; can frequently handle, finger, and feel; must avoid environmental extremes and extremes of heat and cold; must avoid extensive interaction with supervisors, peers or the public; and must not be involved in confrontation, arbitration, or negotiation. The ALJ then asked if there were occupations that such a person could perform regionally or nationally. The VE responded that such a person could work as an assembler at the sedentary level, with 1,400 jobs in the region, 10,000 jobs in the state, and 160,000 in the nation. The ALJ then added additional limitations for a moderate degree of impairment in responding to work changes and completing a workday/workweek. The VE testified that depending upon the ALJ's definition of "moderate," the additional restrictions would have no effect on the number of jobs such a person could perform or would preclude the person from working.

III. Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health &*

---

[3] The transcript is, at the least, puzzling. It indicates that the ALJ invited the ME to ask questions, and the ME did so. The ME then offered his opinions regarding Puchalski's mental condition and capacities. Following this, he offered to give his opinions regarding her residual functional capacity. At that point, according to the transcript, the ME was sworn in, and immediately afterward the examination of the VE began.

*Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In determining that Puchalski was not disabled, the ALJ made the following findings:

1.      The claimant met the disability insured status requirements of the Act on

12

September 16, 2002, the date the claimant stated she became unable to work, and continues to meet them at least through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since her alleged onset date of September 16, 2002.

3. The medical evidence establishes that the claimant has severe impairments of osteoarthritis, dysthymia, and generalized anxiety disorder. She does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's impairments can result in symptoms of pain, depressed moods, and panic attacks. However, her allegations of disabling symptoms and functional limitations resulting from her impairments as to preclude all substantial gainful activity are not reasonably consistent with the objective medical evidence, the criteria of Social Security Ruling 96-7p, 20 CFR 404.1529 and 416.929.

5. The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for work the requires her to perform the exertional requirements of work that does not require her [sic] to lift, carry, push, or pull more than 10 pounds, either frequently or occasionally. Claimant can sit for at least four hours and stand/walk for six hours during the course of an eight-hour workday. From the nonexertional standpoint, the claimant cannot perform frequent stooping or bending or work above the shoulder level and should avoid extremes of temperature. The claimant's mental impairments also result in nonexertional limitations such that he [sic] should not perform more than simple, repetitive tasks in a low-stress work environment and minimal interaction with the public, co-workers, and supervisors.

6. The claimant is unable to perform her past relevant work as a title searcher, medical assistant, and welder.

7. The claimant's residual functional capacity for the full range of sedentary work is reduced by her exertional and nonexertional limitations previously indicated in Finding No. 5.

8. The claimant is 44 years old, which is defined as a "younger individual" and she has been in this age category at all times relevant to this decision.

9. The claimant has more than a high school education.

10. The claimant's transferable skills from past work include cashiering, billing, file management, records keeping and filing, typing, clerical skills, and people

13

[sic].

11. Based on an exertional capacity for sedentary work, and the claimant's age education, and work experience, sections 404.1569 of Regulations No. 4 and 416.969 of Regulations No. 16, and Rule 201.29, Table No. 1, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12. Although the claimant's additional exertional and nonexertional limitations do not allow her to perform the full range of sedentary work, using the above-cited rule as a framework for decision-making, there are a significant number of jobs in the national economy which she could perform.  Examples of such jobs are:  assembler, lens inserter, and small products assembler.  These jobs exist in significant numbers in the claimant's region of Northeast Ohio, her state, and in the national economy.

13. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

Tr. at 23-25.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

14

Puchalski alleges that the ALJ erred because (1) the ALJ failed to consider whether Puchalski's fibromyalgia was a severe impairment; (2) the ALJ found Puchalski not to be credible; (3) the ALJ failed properly to evaluate Puchalski's allegations of pain as a disabling condition; and (4) the ALJ failed to articulate a definition for "moderate restriction," thus precluding substantial evidence for his reliance on the VE's testimony.

A.    *Whether the ALJ erred in failing to consider Puchalski's fibromyalgia as a severe impairment, erred in finding Puchalski not credible, and failed to evaluate properly Puchalski's allegations of pain*

Puchalski's treating physician, Dr. Zangmeister, repeatedly diagnosed Puchalski as suffering from fibromyalgia.  Dr. Saegh, a consulting physician, also described Puchalski as having a history of fibromylagia.  Although the ALJ noted Dr. Zangmeister's diagnosis, the ALJ did not find that fibromyalgia was a severe impairment.  The ALJ summarized Puchalski's impairments as follows:   "[T]he claimant has the severe impairment of osteoarthritis.  However, the claimant's allegations of disabling symptoms and functional limitations related to her impairments are not reasonably consistent with the objective medical evidence."  Tr. at 20.

The ALJ did not perform any analysis to determine whether Puchalski suffered from fibromyalgia, severe or otherwise.  While it is not reversible error to fail to find more than one severe impairment, it is reversible error to fail to analyze properly the limits imposed by all diagnosed conditions.  The ALJ failed to analyze properly the limitations imposed by Puchalski's diagnosed fibromyalgia.

Fibromylagia, which can be a severe impairment, is characterized by musculoskeletal pain, stiffness, and tender points.  *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 243-44, 244 n.3 (6th Cir. 2007); *Preston v. Secretary of Health and Human*

15

*Servs.,* 854 F.2d 815, 817 (6th Cir. 1988); *Swain v. Commissioner of Social Security*, 297

F. Supp. 2d 986 (N.D. Ohio 2003).  It may be accompanied by fatigue, sleep disturbance,

parasthesias,  headache,  depression,  and  anxiety.      *See*  **64  FR  32410**,  32410,

1999 WL 393493 (F.R. June 17, 1999).  Moreover,

> [U]nlike medical conditions that can be confirmed by objective testing, fibromyalgia
> patients present no objectively alarming signs.  Rather, fibromyalgia patients
> "manifest normal muscle strength and neurological reactions and have a full range
> of motion."  The process of diagnosing fibromyalgia includes (1) the testing of a
> series of focal points for tenderness and (2) the ruling out of other possible
> conditions through objective medical and clinical trials.

*Rogers*, 486 F.3d at 243-44 (citations omitted).  To reject a treating physician's diagnosis

of fibromyalgia in a patient exhibiting characteristic tender points and other hallmark

symptoms on the basis that such a diagnosis is inconsistent with objective medical

evidence constitutes reversible error.  *Id.* at 244; *Preston,* 854 F.2d at 820.

Puchalski has consistently complained of, and physicians have noted, muscle pain

and tenderness, fatigue, sleep disturbance, depression, and anxiety.  She has also

frequently reported parasthesia and headaches.  These are the hallmark symptoms of

fibromyalgia.  Her pain has not been alleviated by treatments for osteoarthritis or back

strain, and she has been treated by means of stretching therapy, weight therapy,

chiropractic manipulation, aquatic therapy, electrical stimulation, and analgesic drugs.

Given the symptoms Puchalski exhibits and the repeated failure to alleviate her symptoms

by multiple treatments, the ALJ's failure to address Puchalski's allegation of fibromyalgia

with nothing more than the conclusory statement that "the claimant's allegations of

disabling symptoms and functional limitations related to her impairments are not reasonably

consistent with the objective medical evidence" was reversible error.

16

The Commissioner argues that the ALJ's failure to diagnose fibromyalgia as a severe condition was not reversible error because the ALJ nevertheless continued with the remaining steps of the disability determination.  This included an assessment of the limitations imposed by all Puchalski's conditions, even those that were not severe, in determining whether Puchalski had the residual functional capacity to perform substantial gainful activity.  This reasoning is deeply flawed.

The ALJ determined that because objective medical evidence did not support Puchalski's allegations of disabling symptoms and functional limitations, those allegations were not credible.  Having improperly discounted Puchalski's credibility, the ALJ then failed to perform a proper assessment of Puchalski's credibility pursuant to Social Security Ruling ("SSR") 96-7p or a proper assessment of her allegations of pain pursuant to SSR 96-7p and SSR 95-5p; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036-40 (6th Cir. 1994).  In assessing Puchalski's credibility, supposedly according to SSR 96-7p, the ALJ gave two reasons why he did not give her allegations full credibility:  (1)  her allegations were not consistent with the objective medical evidence and (2) she had been treated conservatively for pain.  As has already been shown, a discounting of credibility for the first reason is erroneous in the case of fibromyalgia.  In assessing Puchalski's treatment for pain, the ALJ noted that Puchalski had not received "other pain relieving devices such as a lumbosacral corset/brace or ambulatory supports such as a cane."  Tr. at 22.  There is no justification in the record for believing that such devices alleviate pain due to fibromyalgia.  The ALJ also wrongly stated that the record does not show that Puchalski has received physical therapy.  The record, in fact, shows that Puchalski engaged in stretching therapy and weight therapy at the direction of her treating physician, received chiropractic manipulation,

17

and received aquatic therapy.  In addition, the ALJ reported that Puchalski did not engage in a "hardening" program.  As already noted, Puchalski attempted weight therapy.  She reported, however, that such muscle effort made her pain worse, a result typical in cases of fibromyalgia.  *See, e.g., Stup v. UNUM Life Ins. Co. of Am.*, 390 F.3d 301, 305-06 (4th Cir. 2004); *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261 (W.D. Pa. 2008); *Martzolf v. Astrue*, 2009 WL 790854 (W.D. Mo. March 23, 2009); *Baker v. Astrue*, 2009 WL 510102 (E.D. Mo. March 2, 2009); *Torres v. Commissioner of Social Sec.*, 2008 WL 3895929 (M.D. Fla. Aug. 20, 2008); and *McLachlan v. Astrue*, 2008 WL 90067, *2 (D.S.C. Jan. 20, 2008) (noting that for persons suffering from fibromyalgia pain is typically aggravated by even mild exertion).  Finally, the ALJ referred to two factors in assessing Puchalski's credibility.  A full assessment of credibility pursuant to SSR 96-7p requires an assessment using at least six factors.[4]  Given that Puchalski essentially alleges that she

---

[4]  Those factors are as follows:

1.  The individual's daily activities;
2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3.  Factors that precipitate and aggravate the symptoms;
4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Although the ALJ did not cite individual daily activities in explaining why he did not give full credibility to Puchalski's representations, he did examine these elsewhere.  He note, "[S]he is able to cook, clean, do laundry, and help take care of her daughter's young children.  She reported that she was enrolled in classes.  The claimant maintains a driver's license and

is precluded from working by disabling pain, the the ALJ's failure to perform a more extensive analysis of her credibility or her allegations of pain is itself necessarily fatal to the ALJ's decision.

In addition to performing a faulty analysis of pain, the ALJ also failed to examine all the limitations imposed by Dr. Zangmeister, Puchalski's treating physician and the author of the opinion to which the ALJ supposedly assigned substantial weight.  In particular, the ALJ ignored the standing and walking limitations imposed by Dr. Zangmeister in determining Puchalski's functional limitations.  In doing so, the ALJ failed to provide any explanation as to why he was not accepting the opinion of Puchalski's treating physician in this regard.  That alone is reversible error.  Indeed, the ALJ merely issued a conclusory opinion regarding Puchalski's ability to stand and walk without performing any analysis of these abilities.  For these reasons, it cannot be said that the ALJ thoroughly assessed Puchalski's functional limitations, severe or otherwise.

Any assessment of the limitations imposed by Puchalski's conditions under these circumstances has no weight.  The decision of the Commissioner, therefore, must be reversed.

B.    *Whether the ALJ erred in failing to articulate a definition for "moderate restriction"*

Puchalski argues as follows:

> The objective evidence in the medical record supports and the ALJ has accepted that the plaintiff has "moderate" difficulties maintaining concentration, persistence and pace (Tr.21).

does drive."  Tr. at 21.  This summation ignores the many caveats and limitations that Puchalski put on her performance of these activities, including infrequent performance and frequent help.  In addition, Puchalski was not enrolled in "classes."  She enrolled in a single class that met twice a week.

19

However, the ALJ fails to explain his reasoning or even identify how he defines the term "moderate".  At the hearing, the ALJ posed a hypothetical where the plaintiff would have a "moderate" degree of impairment in responding to work changes in completing a workday/work week (Tr.293).  The Vocational Expert, recognizing the difficulty in defining this term, gave two answers to the ALJ's hypothetical - one for each definition of moderate (Tr. 293).  She stated, "If you consider moderate, [where] it's difficult for the individual, they have to push and [then] they do it, okay, in that case, she could still do these jobs.  If you define it as maybe 20 percent of the time not able to complete the day or is not able to complete the week . . . then it would be a day a week of missed work and that would not . . . meet the competitive standard [for work]" (Tr.293).

In the hearing decision, the ALJ accepted that the plaintiff has a moderate impairment in concentration, persistence, and pace (which is based upon the findings of moderate limitations in completing a normal workday / workweek and moderate limitations in responding to change in the work setting - see Tr. 177) (Tr.21).  However, he failed to identify how he defined "moderate."

Plaintiff's Brief on the Merits (Doc. No. 15). pp. 14-15 (punctuation in the original).

If there are two possible definitions of "moderate," as plaintiff asserts; if the VE gave answers using both definitions, one of which would permit Puchalski to work and one of which would not; and if the ALJ concluded that Puchalski can work, then it is fairly apparent that the ALJ endorsed the definition of "moderate" which would allow Puchalski to work.  According to plaintiff, however, the other definition of "moderate" is more consistent with the record.  Plaintiff asks, therefore, that the case be remanded to allow the ALJ to clarify what he means by "moderate."

As the case must be remanded for other reasons, asking the ALJ to clarify his definition of "moderate" as used in the above context is reasonable and not overly burdensome.  The ALJ should clarify, therefore, in what respect Puchalski has "moderate" difficulties maintaining concentration, persistence and pace.

VII.  Decision

For the reasons given above, the court VACATES the decision of the Commissioner

20

and remands the case for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**


Date:  July 28, 2009                              s/ Nancy A. Vecchiarelli
                                                  U.S. Magistrate Judge

21